794 P.2d 147

Dennis INGRAM, Petitioner,

v.

James SHUMWAY, Secretary of State of the State of Arizona, Respondent.

and

Evan MECHAM, Real Party in Interest.

No. CV–90–0238–SA.

Supreme Court of Arizona.

July 12, 1990.

Molloy, Jones & Donahue, P.C. by Michael J. Meehan and Robert J. Gorman, Tucson, for petitioner.

Robert K. Corbin by John B. Shadegg and Lisa T. Hauser, Phoenix, for respondent.

MacPherson & McCarville, P.A. by Donald W. MacPherson, Phoenix, for real party in interest.

Rattay & Waldrip by Wade F. Waldrip, Phoenix, for amici curiae Hutchins and Matheson.

Harold Bates and Andrew Cosentino, pro se, amici curiae.

## OPINION

FELDMAN, Vice Chief Justice.

Dennis Ingram (petitioner), a registered voter, brings this original special action proceeding[1] seeking this court's declaration that the real party in interest, Evan Mecham (Mecham), is not a qualified candidate for the office of governor. Petitioner asks us to prohibit the secretary of state

---

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus, or certiorari is now obtained by "special action." Rule 1, Arizona

from taking any action that would place Mecham's name on the ballot for the September 1990 primary election.

## FACTS

Mecham was elected governor of Arizona and took office in January 1987. In 1988, the Arizona House of Representatives adopted three articles of impeachment against Governor Mecham; the Arizona Senate then organized as a court of impeachment and adopted rules of procedure for the impeachment trial. Journal of the Senate (Journal), 38th Leg., 2d Reg. Sess. (1988), at 156.[2]

Rule 23 of those rules of procedure provided:

C.  If two-thirds of the senators elected vote to sustain any Article of Impeachment, or any subsection of an Article, the Court of Impeachment shall pronounce judgment of conviction and removal from office by resolution entered upon the Journal of the Court of Impeachment.

D.  If judgment of conviction is entered, a roll call vote shall be taken on the question of whether the person convicted shall also be disqualified to hold any office of honor, trust or profit under the Constitution and laws of the State. If two-thirds of the Senators elected vote to disqualify, such judgment shall be entered upon the Journal of the Court of Impeachment.

Journal, at 161.

On April 4, 1988, the Senate sustained articles 1 and 3 of the articles of impeachment by more than a two-thirds majority. Thereafter, in accordance with Rule 23(D), the Senate voted 17–13 to disqualify Governor Mecham from holding "any office of honor, trust or profit in the state." The vote on future disqualification passed by a majority but not by the two-thirds vote required by the rule; the Senate then resolved that Governor Mecham "is not further disqualified from holding any office of

honor, trust or profit in the state" and entered judgment.

Sometime later, Mecham announced his intention to seek the nomination of the Republican party for the office of governor in the September 1990 primary election. On June 28, 1990, Mecham timely filed nominating petitions with the secretary of state. For purposes of this case, we must assume the petitions were in proper form and contained the requisite number of signatures to have his name placed on the primary ballot. In addition, Mecham filed the affidavit required by A.R.S. § 16–311, stating that he satisfied all citizenship and residency requirements and would be "qualified at the time of the election to hold the office" of governor. A.R.S. § 16–311(B).

The next day, June 29, 1990, petitioner filed this proceeding, arguing that by virtue of his conviction by the Senate sitting as a court of impeachment, Mecham was automatically disqualified from holding any public office in the state of Arizona. Petitioner's argument is based on the words of the Arizona Constitution, which read in relevant part:

No person shall be convicted without a concurrence of two-thirds of the Senators elected. The Governor and other State and judicial officers ... shall be liable to impeachment for high crimes, misdemeanors, or malfeasance in office, *but judgment in such cases shall extend only to removal from office and disqualification to hold any office of honor, trust, or profit in the State.*

Ariz. Const. art. 8, pt. 2, § 2 (emphasis added).

Petitioner argues that conviction of impeachment "carries with it as an additional [and automatic] penalty the disqualification to hold any office of honor, trust, or profit in the State." Memorandum in Support of Petition for Special Action, at 24 (quoting *State ex rel. DeConcini v. Sullivan,* 66 Ariz. 348, 354, 188 P.2d 592, 596 (1948)).

---

Rules of Procedure for Special Actions, 17B A.R.S.

**2.**  Those interested in the details of this episode in Arizona history may consult *Mecham v. Gordon,* 156 Ariz. 297, 751 P.2d 957 (1988); *Green v.*

*Osborne,* 157 Ariz. 363, 758 P.2d 138 (1988); *Londen v. Shumway,* 158 Ariz. 255, 762 P.2d 542 (1988); and *Mecham v. Arizona House of Representatives,* 162 Ariz. 267, 782 P.2d 1160 (1989).

The issue before us, therefore, is quite simple: does the constitution require that a state officer convicted in an impeachment trial and removed from office also be automatically disqualified from holding any future office in the state?

## THIS COURT'S JURISDICTION IN IMPEACHMENT MATTERS

■ Mecham questions this court's jurisdiction to hear this matter by direct special action, arguing that A.R.S. § 16–351 ("Challenge of Nomination Petitions") gives original jurisdiction of challenges to nominating petitions to the superior court. Although this *may* be true in most cases, in our view this case is much more than a "challenge of nomination petitions." It is, in essence, an effort to ascertain and enforce the correct. interpretation of the impeachment provisions of the constitution. We believe our jurisdiction to hear this case is well founded in the constitutional provisions giving this court original jurisdiction to issue common law writs to state officers and power to issue writs of mandamus, prohibition, and "all other writs necessary and proper to the complete exercise of its ... revisory jurisdiction." Ariz. Const. art. 6, § 5(1) and (4).

Given the separation of powers doctrine, which is nowhere "more explicitly and firmly expressed than in Arizona," this court's jurisdiction is quite limited in impeachment proceedings. *Mecham v. Gordon*, 156 Ariz. 297, 300, 751 P.2d 957, 960 (1988) (citing Ariz. Const. art. 3). Impeachment "is a uniquely legislative *and* political function. It is not judicial." *Id.* at 302, 751 P.2d at 962 (emphasis in original). Our function in the process is "to ensure that the legislature follows the constitutional rules on impeachment." *Id.* Petitioner's argument, of course, is exactly that. He contends that on conviction, the constitution requires both removal *and* future disqualification. Thus, he argues, the Senate was without power to resolve to the contrary, its attempt to do so was a nullity, and conviction and removal of Mecham worked an automatic future disqualifica-

tion. Thus, petitioner argues, he does not ask this court to interfere in the impeachment process but merely to enforce the constitutional mandate.

This, of course, presents another jurisdictional issue raised by Mecham: how long, if ever, before the legislature's resolution of a constitutional issue becomes final? Arguably, an action such as the instant case could have been brought when the Senate implemented the bifurcated procedure in 1988. Perhaps the action could have been brought when the Senate entered its judgment, when Mecham announced he would run for office, when he took out nominating petitions, or at any time prior to the date on which he filed the completed petitions. Petitioner argues that the issue was not ripe and the action could not have been filed until Mecham made the issue "real" by filing his nominating petitions.[3] This may be true, but we are concerned by the prospect that an action such as this might be withheld and filed after the person in question had run for and actually been elected to office. Could a person so elected be removed from office or his actions after being sworn in be contested?

These questions are indeed perplexing but, we believe, need not be answered in light of our view of the merits. We accept special action jurisdiction to decide this matter because it involves a matter of statewide importance, great public interest, and requires final resolution in a prompt manner.

## IS FUTURE DISQUALIFICATION AN AUTOMATIC CONCOMITANT OF IMPEACHMENT AND REMOVAL FROM PUBLIC OFFICE, OR MAY THE LEGISLATURE SEPARATE THE ISSUES OF REMOVAL AND DISQUALIFICATION, IMPEACHING AND REMOVING THE OFFICER ON THE ONE HAND, BUT REFUSING TO DISQUALIFY HIM FROM HOLDING FUTURE OFFICE ON THE OTHER?

■ Petitioner bases his arguments for automatic disqualification on what he

---

**3.** Note, however, that Arizona's constitution contains no analog to the "case and controver-

sy" requirement found in article III, § 2 of the United States Constitution.

believes to be the plain meaning of the text of the constitution and on his view of the interpretation of the federal provisions that, he submits, provided the model after which the Arizona provision was fashioned.[4]

Thus, petitioner argues, because the federal text and meaning are plain, by adopting the federal model (which petitioner believes provides for automatic disqualification), the framers of our constitution must have intended that in Arizona disqualification from future office automatically follows impeachment and removal from office.

The fatal flaw in this position, we believe, is that neither point seems as clear upon contemplation as it does at first glance. First glance seems to have been the origin of this court's words in 1948 in the *Sullivan* case. The statement may or may not have been dictum, but it was certainly unsupported by any authority or analysis. *See* 66 Ariz. at 354, 188 P.2d at 596. The reason for this, no doubt, was that the subject of inquiry in *Sullivan* was not the consequences of conviction but whether impeachment was the only method of removing a public officer, the legislature having enacted a law that, without benefit of a constitutional impeachment process, automatically removed public officers who had been convicted of a felony. The issue presented by the case before us was neither raised, argued, nor actually before the court for decision.

In fact, we find no authority *directly* on point from any state court nor from the United States Supreme Court. This appears to be the first instance in history in which a legislative body has impeached and removed an officer, expressly refusing to punish by disqualification from future office, and in which the officer removed has sought office and been challenged. The Texas case of *Ferguson v. Wilcox*, 119 Tex. 280, 28 S.W.2d 526 (1930), that petitioner advances as his strongest case authority is quite different and in some ways quite similar to *Sullivan*. The language on which petitioner relies clearly states that disqualification automatically follows removal, but again the statement was made without analysis or support. *Id.* 28 S.W.2d at 534. Governor Ferguson had been impeached, removed, *and* the Texas Senate had adjudged him disqualified from holding future office. The issue before the Texas court was the constitutionality of a later statute absolving or pardoning Governor Ferguson.

Thus, we find no direct legal authority to guide us. Nor do we believe the text of the federal and state constitutions is so clear that it is not capable of both readings.[5] To require that the Senate's conviction "shall extend only to" removal from office and disqualification is to limit the Senate from doing anything further than those two things. It is not to say that conviction and removal *must* result automatically in disqualification, nor is it to say the Senate has discretion to do one but not the other. The text is, at best, unclear, leaving room for interpretation.

Nor do we find unambiguous guidance for interpretation of the Arizona impeachment provisions in the works of the found-

---

4. The state and federal provisions are almost identical. The state provision, article 8, part 2, § 2, provides that judgment of conviction "shall extend only to removal ... and disqualification." The federal analog, article I, § 3, provides that "judgment ... shall not extend further than...." The Arizona Constitution's provision indicates that *only* two consequences can result from impeachment: removal and disqualification. The federal provision indicates that no consequence from impeachment can be more serious than removal and disqualification.

5. *See* J. ANDREWS, JURISPRUDENCE: CONSTITUTION AND LAWS § 200, at 243 (1908), and H.C. BLACK, HANDBOOK ON AMERICAN

CONSTITUTIONAL LAW, at 139 (3d ed. 1910) (authors reach different conclusions as to the extent of the judgment); the Nebraska Supreme Court in *State v. Hill*, 37 Neb. 80, 55 N.W. 794 (1893), construed its judgment clause, which was identical to the federal clause, to make disqualification a separate sanction from removal. The Nebraska court relied on J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1891) for the proposition that the federal constitution seems to make disqualification on conviction discretionary. As petitioner claims, Story may have expressed no more than uncertainty as to the meaning of the clause, but that is exactly the point we make.

ing fathers. The debates of the Constitutional Convention of 1787 contain no reference to the intent of the drafters or of the convention itself on this point, nor does there seem to have been any debate on this precise issue. *See* S. PADOVER, TO SECURE THESE BLESSINGS, The Great Debates of the Constitutional Convention of 1787, Arranged According to Topics, at 384–91 (1970).[6]

Nor are Alexander Hamilton's comments in *The Federalist* of great help. Hamilton covered the impeachment question in Federalist Papers Nos. 65 and 66. THE FEDERALIST PAPERS (1982 Bantam Classic edition). In describing the punishment that would follow conviction, Hamilton referred to "perpetual ostracism from ... [the] honors and emoluments," noting that the officer would still be liable to criminal prosecution. *Id.* No. 65 (Bantam ed., at 333). Hamilton's dissertations are far from clear on the precise question before us, though it can certainly be *inferred* that he may have considered disqualification to automatically follow impeachment and removal. *See* 1 THE RECORD OF THE FEDERAL CONVENTION OF 1787, at 272 (Farrand ed. 1911, 1937), as cited in Feerick, *Impeaching Federal Judges: A Study of the Constitutional Provisions*, 39 FORDHAM L. REV. 1, 17–18 (1970).

Of course, Hamilton was only one of the founders, and there is no record from which we may infer what the others thought on this point. The debated question was primarily the necessity of providing a procedure for removal from office of those who had betrayed the public trust, leading to adoption of a motion that the officer be "removable on impeachment." *See* Debate of July 20, 1787, S. PADOVER, at 384. We are left with the conclusion

that Hamilton may have thought disqualification was automatic, but no record exists that he ever stated this in so many words. Nor is there any record that this point was ever the subject of debate at the Constitutional Convention of 1787. As noted, the commentators or scholars do not provide any certainty on the question of automatic disqualification.[7]

We do have, however, some guidance for interpretation. First, contrary to petitioner's position, in the early days of the country it seems that disqualification was not thought to be an integral part of a judgment of impeachment in federal cases. In 1803, the United States Senate (containing members who had been delegates to the Constitutional Convention of 1787) voted to remove Judge John Pickering. The judgment had no provision that Pickering would also be disqualified from future office. 3 A. HINDS, HINDS' PRECEDENTS ON THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES § 2341, at 709–10 (1907); *see also* Feerick, *supra*, 39 FORDHAM L. REV. at 28.

Sixty years later, during the impeachment trial of Judge West H. Humphreys, the Senate debated whether removal and disqualification were divisible questions. Using the Pickering case as authority, the presiding officer ruled that separate votes would be taken on removal and disqualification. HINDS' PRECEDENTS § 2397, at 820; Feerick, *supra*, 39 FORDHAM L.REV. at 32. The Senate subsequently voted in two stages: voting 38–0 for removal and 36–0 for disqualification. It appears, therefore, to have been the view of the Senate that the provision regarding removal and disqualification presents divisi-

---

6. Impeachment was covered in the debates of June 2, July 20, and September 8, 1787. The method of impeachment was agreed on at the June 2 debate, the advisability of having an impeachment clause at all was debated on July 20, and the causes or grounds for impeachment debated on September 8. None of these debates touched at all on the question of automatic disqualification. While Padover's work is based, in part, on J. ELLIOT, DEBATES ... OF THE CONGRESS OF THE CONFEDERATION

(1827) and DEBATES IN THE SEVERAL STATE CONVENTIONS (1861)—works subject to some question—there is nothing in any other work that calls into question the portion of Elliot's work dealing with the impeachment issue. *See* J.H. Hutson, *The Creation of the Constitution: The Integrity of the Documentary Record*, 65 TEXAS L.REV. 1 (1986).

7. *See* note 5, *supra*.

ble questions.[8]

All the precedent cited, of course, falls far short of providing a definitive interpretation of the meaning of the federal judgment clause or the intent of the founders. It does, however, demonstrate that the text of the judgment clause, article I, § 3 of the United States Constitution, can be, and since early in its history has been, read either way.

We believe some relevant Arizona history is more telling. Our constitution was written in 1910 and went into effect at statehood on February 14, 1912. The first legislature of this state enacted a provision that read:

> The judgment [in an impeachment proceeding] may be that the defendant be removed from office *or* that he be removed from office and disqualified to hold any office of honor, trust or profit under the state.

Ariz.Pen.Code 1913 § 804 (emphasis added). This provision, in almost identical language, is still part of our statutes. *See* A.R.S. § 38–321. While again far from definitive, the passage of the statute certainly provides some evidence that the constitutional provision may be read, and was read, as allowing the legislative body discretion over the issue of future disqualification. It also may provide some evidence as to the intent of some of the framers because at least six members of the first legislature had been delegates to the 1910 Arizona Constitutional Convention.

Because interpretation is required, and we deal with an ambiguous text, unexpressed or unarticulated intent of the framers, and a conflicting historical record, we must also consider both purpose and policy. The purpose of the federal judgment clause providing that judgment shall not "extend further than" was to prevent the imposition of discretionary punishments, such as had been the custom of the English Parliament, extending beyond removal and disqualification and including fines, imprison-

ment, and even death. *See, e.g.,* Feerick, *supra,* 39 FORDHAM L.REV. at 6 n. 23, 48 n. 273. By limiting discretion, no intent to abolish it can be inferred so as to mandate a particular unitary penalty.

Turning finally to policy, we have previously stated that election, the ultimate weapon of democracy, is favored where any doubt exists. *See Bolin v. Superior Court,* 85 Ariz. 131, 333 P.2d 295 (1958). We believe this is particularly important in impeachment cases. Impeachment, essentially a political process, is not subject to judicial review. *Mecham v. Arizona House of Representatives,* 162 Ariz. 267, 268, 782 P.2d 1160, 1161 (1989). No appeal for trial error to this or any court lies from the judgment of conviction rendered by the Senate. *Id.* While the House, which adopts the articles of impeachment and thus prefers the charges, and the Senate, which tries them, are the representatives of the people, the people nonetheless retain the right to speak directly by their votes. On political matters, the will of the majority is determinative. Any appeal from the impeachment conviction lies in the electoral process. Given a choice of interpretation of textual direction in the constitution, we hold that where the Senate has removed an officer but declined to disqualify him, the Arizona Constitution leaves the question of whether the impeached official should again hold public office in Arizona to the will of the people.

Relief is therefore denied. Respondent Shumway and real party in interest Mecham are allowed their costs; Mecham's request for attorney's fees is denied.

CAMERON, MOELLER, CORCORAN and LIVERMORE, JJ., concur.

GORDON, C.J., did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, the Honorable LIVERMORE, Judge of the Court of Appeals, Division Two, was designated to sit in his stead.

---

8. A chart of congressional votes on impeachment submitted by Mecham is attached as Appendix A. The details can also be found in Feerick, *supra,* 39 FORDHAM L.REV. at 23–47.

Of particular interest are the 1936 proceedings involving Judge Halsted L. Ritter in which the Senate voted in favor of removal but unanimously against disqualification. *Id.* at 47.

# Congressional Votes on Impeachment, 1797-1936

The following table shows the votes by which the 13 federal officials impeached prior to 1976 were impeached by the House, and the subsequent Senate votes on their cases. The dates in parentheses are the dates on which the votes were taken.

The series of votes following some of the "guilty" or "not guilty" verdicts of the Senate are the votes on each article of impeachment. Although only a majority vote by the House is required to impeach, a two-thirds vote by the Senate is required to convict on any article of impeachment. After a man is found guilty on any of the articles, the Senate votes on whether to remove him from office—that vote is carried by a majority. Sometimes the Senate goes beyond that vote and votes on disqualifying the man from any future federal office; that vote too requires only majority approval.

| | House | Senate |
|---|---|---|
| Blount | Voice (July 7, 1797) | Dismissed, 14-11 (Jan. 11, 1799) |
| Pickering | 45-8 (March 2, 1803) | Guilty, 19-7, 19-7, 19-7, 19-7 Removed from office, 20-6 (March 12, 1804) |
| Chase | 73-32 (March 12, 1804) | Not guilty, 16-18, 10-24, 18-16, 18 16, 0-34 4-30, 10-24, 19-15 (March 1, 1805) |
| Peck | 123-49 (April 24, 1830) | Not guilty, 21-22 (Jan 31, 1831) |
| Humphreys | Voice (May 6, 1862) | Guilty, 39-0, 36-1, 33-4, 28-10, 39-0, 36-1 12-24, 35-1, 35-1 Removed from office, 38-0 Disqualified from future office, 36-0 (June 26, 1862) |
| Johnson | 57-108 against impeachment (Dec. 6, 1867) 126-47 for impeachment (Feb. 24, 1868) | Not Guilty, 35-19, 35-19, 35-19 (May 16, 26, 1868) |
| Delahay | Voice (Feb. 28, 1873) | None |
| Belknap | Voice (March 2, 1876) | Not guilty, 35-25, 36-25, 36-25 37-25. (Aug. 1, 1876) |
| Swayne | Voice (Dec. 13, 1904) | Not guilty, 33-49, 32-50, 13-69, 13-69, 31-51, 19-63, 31-51, 31 51, 31-51, 31-51, 35-47. (Feb. 27, 1905) |
| Archbald | 223-1 (July 11, 1912) | Guilty, 68 5, 46-25, 60-11, 52-20, 6o o, 24-45, 29-36, 22-42, 23-39, 1-65, 11 51, 19-46, 42-20 Removed, voice. Disqualified, 39-35 (Jan. 13, 1913) |
| English | 306-62 (April 1, 1926) | Dismissed, 70 9 (Dec. 13, 1926) |
| Louderback | 183-142 (Feb. 24, 1933) | Not guilty, 34-42, 23-47, 11-63, 30-47, 45-34 (May 24, 1933) |
| Ritter | 181-146 (March 2, 1936) | Guilty, 55-29, 52-32, 44-39, 36-48, 36-48 40-37, 56-28. Removed, voice. Not disqualified, 0-76 against. (Apr 17, 1936) |

Sources: Impeachment: Selected Materials on Procedure, House Committee on the Judiciary, January 1974; Congressional Globe 1868; Ritter data, Congressional Record, Vol. 80, April 17, 1936.