311 P.3d 1093

ARIZONA CITIZENS CLEAN ELECTIONS COMMISSION; Louis J. Hoffman; Victoria Steele; Arizona Advocacy Network, Petitioners,

v.

The Honorable Mark H. BRAIN, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

Ken Bennett, in his official capacity as Secretary of State; Andy Biggs, in his official capacity as President of the Arizona State Senate; Andrew M. Tobin, in his official capacity as Speaker of the Arizona House of Representatives, Real Parties in Interest.

No. 1 CA–SA 13–0239.

Court of Appeals of Arizona, Division 1, Department C.

Oct. 24, 2013.

Ballard Spahr, LLP By Joseph A. Kanefield and Brunn W. Roysden, III, Phoenix, Attorneys for Petitioner Arizona Citizens Clean Elections Commission.

Osborn Maledon, P.A. By Mary R. O'Grady and Timothy J. Eckstein and Christina C. Rubalcava, Phoenix, and Arizona Center for

Law in the Public Interest By Timothy M. Hogan, Phoenix, Attorneys for Petitioners Louis J. Hoffman, Victoria Steele, and Arizona Advocacy Network.

Richard Rice, Acting Arizona Attorney General By David D. Weinzweig, Senior Litigation Counsel and Daniel P. Schaack, Assistant Attorney General, Phoenix, Attorneys for Real Party in Interest Ken Bennett, Secretary of State.

Snell & Wilmer, LLP By Michael T. Liburdi and Kelly A. Kszywienski, Phoenix, and Office of the President, Arizona State Senate By Gregrey G. Jernigan, Phoenix, and Office of the Speaker, Arizona House of Representatives By Peter A. Gentala and Pele K. Peacock, Phoenix, Attorneys for Real Parties in Interest Andy Biggs, President of the Arizona State Senate, and Andrew M. Tobin, Speaker of the Arizona House of Representatives.

Goldwater Institute Scharf–Norton Center for Constitutional Litigation By Clint Bolick and Kurt M. Altman and Taylor C. Earl and Nicholas C. Dranias, Phoenix, Attorneys for Amicus Curiae Stephen Pierce, Toby Farmer, and Southern Arizona Conservative PAC.

## OPINION

NORRIS, Judge.

¶ 1 This special action arises from an order of the superior court refusing to preliminarily enjoin the provisions of House Bill 2593 that changed campaign contribution limits for statewide and legislative candidates for public office. According to Petitioners, these provisions violate the Citizens Clean Elections Act and the Voter Protection Act. Because the superior court misconstrued the section of the Clean Elections Act that established campaign contribution limits for those candidates--which, as we explain, remains in effect--and failed to make adequate findings, we accepted special action jurisdiction, granted relief, and preliminarily enjoined the Secretary from enforcing or implementing the provisions of House Bill 2593 as applied to candidates for statewide and legislative of-

fice, with an opinion to follow. This is that opinion.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 In the November 1998 general election, Arizona voters approved Proposition 200, an initiative measure commonly referred to as the Clean Elections Act. *See* Proposition 200, 1999 Ariz. Sess. Laws 1942, 1942–65 (codified at Ariz. Rev. Stat. ("A.R.S.") §§ 16–940 to –961). As relevant here, the Clean Elections Act created an alternative campaign financing system whereby candidates for statewide and legislative office who agreed to limit their fundraising and spending would receive public campaign financing. In addition to establishing the Arizona Citizens Clean Elections Commission--one of the Petitioners here--to administer this system, the Clean Elections Act imposed campaign contribution limits for candidates for statewide and legislative office who opted not to participate in the public financing system ("non-participating candidates"). Specifically, in what became codified as A.R.S. § 16–941(B), the Clean Elections Act restricted how much money a contributor could give to a non-participating candidate each election cycle, the aggregate amount a non-participating candidate could accept from political committees in an election cycle, and the aggregate amount an individual could give on an annual basis to all non-participating candidates and political committees that give to such candidates (collectively, "the § 941 limits"). 1999 Ariz. Sess. Laws at 1943–44.

¶ 3 The § 941 limits were not set out in dollars and cents. Instead, A.R.S. § 16–941(B) barred non-participating candidates from accepting contributions in excess of amounts 20% less than the limits specified in another Arizona statute, A.R.S. § 16–905, a 1986 voter-approved initiative that had established campaign contribution limits--limits the Legislature increased in 1993, 1994, and 1997.[1] Thus, in practical terms, A.R.S. § 16–941(B) adopted contribution limits for statewide and legislative candidates at 80% of the limits identified in A.R.S. § 16–905. As ap-

---

1. 1993 Ariz. Sess. Laws, ch. 226, § 4 (1st Reg. Sess.); 1994 Ariz. Sess. Laws, ch. 379, § 2 (2d Sess.);    Reg. Sess.); 1997 Ariz. Sess. Laws, ch. 201, § 6 (1st Reg. Sess.).

proved by the voters in 1998, A.R.S. § 16–941(B) read as follows:

> Notwithstanding any law to the contrary, a non-participating candidate:
>
> 1. Shall not accept contributions in excess of an amount that is twenty percent less than the limits specified in section 16–905, subsections A through G, as adjusted by the Secretary of State pursuant to section 16–905, subsection J. Any violation of this paragraph shall be subject to the civil penalties and procedures set forth in section 16–905, subsections L through P and section 16–924.

1999 Ariz. Sess. Laws at 1943–44.

¶ 4 In addition to enacting the Clean Elections Act, the voters also approved the Voter Protection Act ("VPA") in the 1998 general election. *See* Proposition 105, 1999 Ariz. Sess. Laws 1937, 1941. The VPA limits the Legislature's authority to modify voter-approved initiatives and referenda. *Id.* As relevant here, the VPA bars the Legislature from amending or superseding a voter-approved initiative unless the proposed legislation "furthers the purposes" of the initiative and is approved by a three-fourths vote in the House of Representatives and Senate. Ariz. Const. art. 4, pt. 1, § 1(6)(C), (14).

¶ 5 In April 2013, the Governor signed House Bill 2593, which had passed both houses of the Legislature by a simple majority vote. 2013 Ariz. Sess. Laws, ch. 98 (1st Reg. Sess.). House Bill 2593 did not, on its face, amend A.R.S. § 16–941(B). *Id.* Instead, House Bill 2593 amended A.R.S. § 16–905 by increasing the amount of money a contributor could give to a non-participating candidate running for a statewide or legislative office. *Id.* at § 2. By way of illustration, the

individual contribution limit per election cycle for a legislative candidate increased from $390 to $4000.[2] *Id.* House Bill 2593 also eliminated the restrictions on the aggregate amount of money a non-participating candidate could receive from political committees each election cycle as well as the aggregate amount an individual could contribute to non-participating candidates and political committees that give to such candidates. *Id.*

¶ 6 In July 2013, the Commission and the other Petitioners sued the Secretary of State and requested a declaration that the provisions of House Bill 2593 that increased the limits for contributions to non-participating candidates for statewide and legislative office and repealed the aggregate limits on annual contributions by individuals to such candidates, as well as political committees that give to such candidates, were unconstitutional. *See* 2013 Ariz. Sess. Laws, ch. 98, §§ 1, 2. Petitioners also requested an injunction enjoining the Secretary from preliminarily and permanently implementing and enforcing those specific provisions of House Bill 2593.[3] In requesting such relief, Petitioners argued A.R.S. § 16–941(B) fixed the § 941 limits at 80% of the limits set out in A.R.S. § 16–905 as of 1998, subject to adjustment for inflation by the Secretary. Although Petitioners also acknowledged the Legislature could amend the § 941 limits if it complied with the requirements of the VPA, they argued that because the Legislature had not done so in passing House Bill 2593, it was unconstitutional under the VPA. In a separate motion, Petitioners requested the court to preliminarily enjoin the Secretary from implementing Sections 1 and 2 of House Bill 2593 with respect to non-participating candidates for statewide and legislative office.

---

2. Before House Bill 2593, A.R.S. § 16–905 specified an individual could contribute $488 to a non-participating candidate running for a legislative office. A.R.S. § 16–905 (Supp. 2012) (amended 2013). Section 16–941(B) reduced that sum by 20% to $390. As amended by House Bill 2593, A.R.S. § 16–905 now specifies a person may contribute $2500 to a non-participating candidate running for a legislative office. 2013 Ariz. Sess. Laws, ch. 98, § 2. Section 16–941(B) would reduce that sum by 20% to $2000. However, because House Bill 2593 also modified the definition of "election" so that a primary and a general election are now treated as separate elec-

tions, it actually doubled the total amount a person may contribute to a non-participating candidate running for legislative office per election cycle from $2000 to $4000.

3. Petitioners did not challenge the constitutionality of any of the other provisions of House Bill 2593, including the provisions that changed campaign contribution limits for candidates for local office. Accordingly, all references in this opinion to House Bill 2593 refer only to the particular provisions contained in Sections 1 and 2 of House Bill 2593 challenged by Petitioners.

¶ 7 In response, the Secretary, joined by the President of the Senate and the Speaker of the House of Representatives as Intervenors, argued A.R.S. § 16–941(B) merely established a formula for the calculation of the § 941 limits and that, consequently, the Legislature could adjust the § 941 limits by amending A.R.S. § 16–905 which was not subject to the VPA. Thus, they argued, House Bill 2593 was constitutional. Separately, the President and Speaker also argued that if A.R.S. § 16–941(B) fixed campaign contribution limits as of A.R.S. § 16–905's 1998 limits, subject only to adjustment by the Secretary, those limits were unconstitutional under the Arizona Constitution and the First Amendment to the United States Constitution.

¶ 8 After briefing and argument, the superior court refused to preliminarily enjoin the Secretary from implementing House Bill 2593, which then went into effect on September 13, 2013. Among other things, the superior court agreed the Clean Elections Act adopted a formula "which required the use of amounts specified in § 16–905," rejected Petitioners' construction of A.R.S. § 16–941(B), and, accordingly, found Petitioners had failed to show a strong likelihood of success on the merits. And, "in light of the First Amendment issues presented," the court stated it was unable to "conclude at this juncture that irreparable harm will occur, nor that the balance of the hardships or public interest favors the entry of a preliminary injunction."

## JURISDICTION

¶ 9 In the exercise of our discretion, we accepted special action jurisdiction. The issues addressed in this special action present questions of law of statewide importance. *Jordan v. Rea,* 221 Ariz. 581, 586, ¶ 8, 212 P.3d 919, 924 (App.2009). Further, although the denial of a preliminary injunction is an appealable order, A.R.S. § 12–2101(A)(5)(b) (Supp.2012), under the circumstances, these issues require a "final resolution in a prompt manner." *Ingram v. Shumway,* 164 Ariz. 514, 516, 794 P.2d 147, 149 (1990).

## DISCUSSION

### I. Standing

¶ 10 As an initial matter, the President and Speaker argue the superior court should not have addressed the Petitioners' arguments because they did not have standing to challenge House Bill 2593. In our original briefing order, we advised the parties we would not entertain cross-petitions requesting special action relief. We also instructed that if the responding parties sought affirmative relief, they would have to file a separate special action and seek consolidation with this matter. The President and Speaker did not do so. Further, the superior court found the Commission "appears" to have standing to challenge House Bill 2593 in a separate order that is not part of this special action. Accordingly, that order is not properly before us. *Costa v. Mackey,* 227 Ariz. 565, 568, 261 P.3d 449, 452 (App.2011) (real party in interest in special action "cannot seek affirmative relief via a response to a special action petition").

¶ 11 Nevertheless, the Commission has standing in this matter. The Commission is statutorily charged with enforcing the Clean Elections Act. A.R.S. § 16–956(A)(7) (Supp. 2012). Thus, the Commission has standing to seek relief to determine how to meet its statutorily prescribed duty.

¶ 12 Next, as an elected official, Steele has standing to challenge the validity of House Bill 2593. Steele has an individualized grievance because her decision whether to run for another term is dependent on the interpretation of House Bill 2593. Steele also has standing to determine how House Bill 2593 will affect her upcoming campaign. *See Dobson v. State ex rel. Comm'n on Appellate Court Appointments,* 233 Ariz. 119, 121, ¶ 11, 309 P.3d 1289, 1292 (2013) (Arizona's declaratory judgment statute, A.R.S. § 12–1832 (2003), implicitly recognizes a person's right to seek a declaratory judgment when her "rights, status or other legal relations" are affected.).

¶ 13 Moreover, the cases the President and Speaker cite in support of their argument that the other Petitioners, Hoffman and the Arizona Advocacy Network,

lack standing are not binding on this court as it is well-settled that we are not bound by federal standing jurisprudence. *See id.,* ¶ 9, 309 P.3d at 1292 ("Our decision to recognize standing turns on 'questions of prudential or judicial restraint.'" (quoting *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.,* 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985))); *see also Armory Park Neighborhood Ass'n,* 148 Ariz. at 6, 712 P.2d at 919 ("We have previously determined that the question of standing in Arizona is not a constitutional mandate since we have no counterpart to the 'case or controversy' requirement of the federal constitution." (citing *State v. B Bar Enters.,* 133 Ariz. 99, 649 P.2d 978 (1982))).

## II. A.R.S. § 16–941(B) versus House Bill 2593

¶ 14 Petitioners argue, as they did in the superior court, that House Bill 2593 is unconstitutional because it attempts to amend or supersede the § 941 limits as applied to non-participating candidates for statewide and legislative office without compliance with the VPA. Petitioners also argue, however, we do not need to decide this issue because, under well-established principles of statutory construction, House Bill 2593 is "ineffective." Specifically, Petitioners argue that because A.R.S. § 16–941(B) applies "[n]otwithstanding any law to the contrary," if A.R.S. § 16–941(B) fixed campaign contribution limits as they existed in 1998 subject to authorized adjustments,[4] then A.R.S. § 16–941(B) preempts, or trumps, House Bill 2593 and the § 941 limits remain in effect.[5]

¶ 15 The President and Speaker argue we should not take up this statutory construction argument because Petitioners failed to raise it in the superior court. Although Petitioners failed to present this precise argument to the superior court, the meaning of A.R.S. § 16–941(B) has been, and is, the central issue in this case. Not only did the parties extensively brief the meaning of A.R.S. § 16–941(B) in the superior court, but the court necessarily had to consider the meaning of A.R.S. § 16–941(B) when it decided this statute only established a formula for setting contribution limits. Accordingly, we address Petitioners' statutory construction argument. And, as we explain, we agree with Petitioners.

¶ 16 If the language of an initiative is clear and unambiguous and subject to only one reasonable meaning, we apply the language without using other means of statutory construction. *Fogliano v. Brain ex rel. County of Maricopa,* 229 Ariz. 12, 18, ¶ 17, 270 P.3d 839, 845 (App.2011) (quoting *State v. Gomez,* 212 Ariz. 55, 57, ¶ 11, 127 P.3d 873, 875 (2006)). Whether, on its face, A.R.S. § 16–941(B) fixed campaign contribution limits as of the 1998 limits then in effect under A.R.S. § 16–905 or, instead, enacted a formula that allows the Legislature to adjust campaign contribution limits by amending A.R.S. § 16–905, is not clear and the competing interpretations advanced by the parties are reasonable.

¶ 17 When the meaning of an initiative is subject to more than one reasonable interpretation, our task is to determine voter intent. To do this we exercise de novo re-

---

4. As noted, Petitioners have acknowledged the § 941 limits, albeit fixed as of 1998, are nevertheless subject to inflation adjustment by the Secretary and to amendment by the Legislature if it complies with the VPA. For the sake of brevity, therefore, throughout the remainder of this opinion we refer to these adjustments collectively as the "authorized adjustments." In this regard, we note the Legislature adjusted the § 941 limits in 2007 by amending A.R.S. § 16–905, but did so in compliance with the VPA. Indeed, the Legislature declared "that the provisions of this act further the purposes" of the Clean Elections Act and that the act "fully complies" with the VPA. 2007 Ariz. Sess. Laws, ch. 277, § 12 (1st Reg. Sess.).

5. "The legislature has often used language such as 'notwithstanding any other statute' or 'notwithstanding any other provision to the contrary' to indicate that a particular provision will trump any conflicting statutes." *State v. Jones,* 232 Ariz. 448, 450, ¶ 11, 306 P.3d 105, 107 (App. 2013) (citing examples). *See also State v. Pereyra,* 199 Ariz. 352, 354, ¶ 7, 18 P.3d 146, 148 (App.2001) ("[N]otwithstanding any law to the contrary" language in initiative "explicitly and comprehensively" superseded laws to the contrary.).

view,[6] *State v. Estrada,* 201 Ariz. 247, 250, ¶ 15, 34 P.3d 356, 359 (2001), and apply well-established principles of statutory construction. We interpret the statute as a whole and consider the statute's language, context, subject matter, historical background, effects and consequences, as well as its spirit and purpose. *Ariz. Early Childhood Dev. & Health Bd. v. Brewer,* 221 Ariz. 467, 470, ¶ 10, 212 P.3d 805, 808 (2009); *Calik v. Kongable,* 195 Ariz. 496, 500, ¶ 16, 990 P.2d 1055, 1059 (1999). We begin with the language of A.R.S. § 16–941(B).

¶ 18 As discussed, A.R.S. § 16–941(B) set contribution limits by reducing the limits "specified" in several subsections of A.R.S. § 16–905. Section 16–941(B) did not simply adopt the A.R.S. § 16–905 limits; it reduced those limits by 20% and allowed the Secretary to periodically adjust the limits for inflation. Allowing only the Secretary to adjust the adopted limits, and only for inflation, undercuts the notion that A.R.S. § 16–941(B) merely adopted a formula for campaign contribution limits that could be adjusted by the Legislature without VPA compliance. Further, the language in A.R.S. § 16–941(B) allowing the Secretary to adjust the limits for inflation would have been superfluous if that statute adopted the limits in A.R.S. § 16–905 on a one-time-only basis because in 1998, A.R.S. § 16–905 already included a mechanism for inflation adjustment. *See* A.R.S. § 16–905 (1998).

¶ 19 Moreover, A.R.S. § 16–941(B) begins with the phrase "[n]otwithstanding any law to the contrary." *See supra* ¶ 14. Had A.R.S. § 16–941(B) only created a formula that could be easily adjusted by the Legislature through amendments to A.R.S. § 16–905, there would have been no reason to include this phrase. The inclusion of this phrase indicates A.R.S. § 16–941(B) was to stand on its own and to have significance separate and apart from A.R.S. § 16–905.

¶ 20 The context, background, and purpose of the Clean Elections Act also support Petitioners' construction of A.R.S. § 16–941(B). As noted, in 1986, the voters established A.R.S. § 16–905's original campaign contribution limits. Their intent, as expressed in the initiative, was "to limit campaign contributions so as to prevent improper influence over state and local elected officials and to foster public confidence in the integrity of government."[7] Proposition 200 § 1, 1987 Ariz. Sess. Laws 1505, 1505. Arguments in favor of the limits contained in the Secretary of State's publicity pamphlet for the 1986 general election stressed the destructive nature of unregulated and unlimited campaign contributions. 1986 Publicity Pamphlet 32, 36–37. These arguments ranged from "[m]oney talks in Arizona politics, all too loudly" to " '[o]ne person, one vote' becomes meaningless when individuals are competing with groups and the wealthy for influence in setting public policy. . . . The only way to take government away from the vested interests is by limiting the amount of money candidates can accept." *Id.* Despite these sentiments, in the 1990s, the Legislature increased these voter-imposed limits three times. *See supra* ¶ 3.

¶ 21 Those increases occurred against a backdrop of corruption scandals that had rocked Arizona politics. The scandals ranged from the 1988 indictment of Governor Evan Mecham for, *inter alia,* allegedly hiding a $350,000 campaign loan, to what became known as "AzScam," a 1991 police sting operation that documented several Arizona legislators accepting bribes in exchange for votes. *See generally State v. Walker,* 185 Ariz. 228, 914 P.2d 1320 (App.1995); Andrew Spencer, Note, *Cleaning Elections,* 54 Ariz. L. Rev. 277, 278–80 (2012).

¶ 22 These scandals, as well as dissatisfaction with the private campaign finance system, led to the Clean Elections Act. As

---

6. Although generally we review a superior court's order denying a preliminary injunction for an abuse of discretion, our review is also de novo when, as is the case here, the underlying issues involve statutory construction. *Kromko v. City of Tucson,* 202 Ariz. 499, 501, ¶ 4, 47 P.3d 1137, 1139 (App.2002).

7. "In determining the purpose of an initiative, we consider such materials as statements of findings passed with the measure as well as other materials in the Secretary of State's publicity pamphlet available to all voters before a general election." *Ariz. Early Childhood Dev. & Health Bd.,* 221 Ariz. at 471, ¶ 14, 212 P.3d at 809.

stated in the initiative, the "Clean Elections system" was intended to "improve the integrity of Arizona state government by diminishing the influence of special-interest money" and reform the "current election-financing system" which allowed "Arizona elected officials to accept large campaign contributions from private interests over which they have governmental jurisdiction." Proposition 200 § 1, 1999 Ariz. Sess. Laws at 1942.

¶ 23 The electorate achieved these goals by creating a public financing system for state-wide and legislative offices and restricting then-current campaign contribution limits. As Petitioners have argued here, to construe A.R.S. § 16–941(B) as merely establishing a formula for setting campaign contribution limits would transform A.R.S. § 16–941(B) "into a meaningless arithmetic exercise." Such a construction would permit the Legislature to increase campaign contribution limits to any level simply by amending A.R.S. § 16–905, thereby rendering A.R.S. § 16–941(B) virtually meaningless.[8]

¶ 24 A traditional principle of statutory construction additionally supports Petitioners' construction of A.R.S. § 16–941(B). As a general rule, a statute may refer to another act and incorporate part or all of it by reference. When a statute adopts or refers to another statute by a specific reference, as A.R.S. § 16–941(B) does here, the " 'adoption takes the [adopted] statute as it exists at the time of adoption and does not include subsequent additions or modifications of the [adopted] statute unless it does so by express intent.' " *Nelson Machinery Co. v. Yavapai County,* 108 Ariz. 8, 9, 491 P.2d 1132, 1133 (1971) (quoting R.J. Fox, Annotation, *Effect of Modification or Repeal of Constitutional or Statutory Provision Adopted by Reference in Another Provision,* 168 A.L.R. 627 (1947)). As enacted by the voters, nothing in A.R.S. § 16–941(B) expressed an intent the Legislature, through subsequent amendments to A.R.S. § 16–905, could

change the § 941 limits, except as the voters had otherwise authorized. *See supra* note 4.

¶ 25 Despite this principle of statutory construction and the language, context, background, and purpose of A.R.S. § 16–941(B), the Secretary, President, and Speaker argue the voters could not have known they were voting for fixed contribution limits because the Clean Elections Act did not list the § 941 limits in dollars and cents. We reject this argument. The proposed initiative did not pull the wool over the voters' eyes when it came to establishing the § 941 limits. As discussed below, the voters were well-informed that the Clean Elections Act, if enacted, would reduce campaign contribution limits on a firm, going forward basis.

¶ 26 First, the ballot language advised voters the Clean Elections Act would reduce "current contribution limits by 20% for non-participating candidates." 1998 Publicity Pamphlet 60, 92. The ballot also advised voters that a "yes" vote would have the effect of "reducing the current contribution limits for nonparticipating candidates by 20%." *Id.*

¶ 27 Second, the publicity pamphlet for the 1998 general election advised voters the Clean Elections Act would reduce current campaign contribution limits. The Legislative Council's analysis explained the "proposition would also reduce by twenty percent the amount per individual that can currently be contributed to a candidate if they opt not to receive the public funding." *Id.* at 84. The arguments "for" the Clean Elections Act discussed the "negative influence of campaign contributions," *id.* at 85, and explained the proposed law would "limit the amount of money our candidates spend on their races," *id.* at 86, take "big money out of politics," *id.* at 89, "reduce the role of special interest money [and] ratchet-down the expense of political campaigns." *Id.* Indeed, the "against" arguments explained that, if enacted, "the act goes on to punish non-taxpayer funded candidates by reducing their fundraising ability by 20% if they don't participate," *id.,* and would "penalize[ ] candidates

---

8. As Petitioners also point out, if A.R.S. § 16–941(B) merely established a formula for setting campaign contribution limits, the Legislature could negate the 20% reduction in campaign

contribution limits that statute requires by simply increasing the amounts identified in A.R.S. § 16–905 by 125%.

who chose not to participate in this public finance scheme. Arizona already has some of the nation's strictest contribution limits. It further restricts a campaign contribution given by you to a candidate of your choice." *Id.* at 91.

¶ 28 Given the ballot language, the Legislative Council's analysis, and the "for" and "against" arguments, the voters were sufficiently informed the Clean Elections Act would significantly reduce campaign contributions by establishing firm limits on a going forward basis.

¶ 29 The President and Speaker also argue that because the Clean Elections Act did not identify the § 941 limits in dollars and cents, it violated a provision in the Arizona Constitution that states "[n]o act or section thereof shall be revised or amended by mere reference to the title of such act, but the act or section as amended shall be set forth and published at full length." Ariz. Const. art. 4, pt. 2, § 14. The purpose of this constitutional provision is to ensure the Legislature does not amend a statute without having and giving notice of the proposed amending language and, consequently, having and giving notice as to what the statute, if amended, will do. *See City of Sierra Vista v. Director, Ariz. Dept. of Envtl. Quality*, 195 Ariz. 377, 381–82, ¶¶ 13–14, 988 P.2d 162, 166–67 (App. 1999); *see also In re Miller*, 29 Ariz. 582, 594–95, 244 P. 376, 379–80 (1926).

¶ 30 Assuming this constitutional provision also applies to initiatives,[9] we reject the President and Speaker's argument as it rests on a

faulty premise--that A.R.S. § 16–941(B) amended A.R.S. § 16–905. Section 16–941(B) did not amend A.R.S. § 16–905; instead, A.R.S. § 16–941(B) adopted the campaign contribution limits listed in A.R.S. § 16–905 for non-participating candidates for statewide and legislative office as they existed in 1998 subject to authorized adjustments.

¶ 31 To sum up: we agree with Petitioners that, as a matter of statutory construction, when the voters enacted the Clean Elections Act in 1998, they fixed campaign contribution limits as they existed in 1998, subject to authorized adjustments. The voters did not adopt a mere formula that would allow the Legislature to easily amend the § 941 limits. And, because the voters instructed that A.R.S. § 16–941(B) would apply "[n]otwithstanding any law to the contrary," that statute preempts the sections of House Bill 2593 at issue here. To this extent, House Bill 2593 is, as Petitioners argue, ineffective, and the § 941 limits applicable to non-participating candidates for statewide and legislative office remain in effect.[10]

## III. Preliminary Injunction Factors and the First Amendment

¶ 32 Traditionally, in addition to showing "a strong likelihood of success on the merits," a party seeking a preliminary injunction must also show the possibility of irreparable harm if the court does not grant the requested relief, and that the balance of hardships and public policy favor issuance of

---

9. Petitioners argue this constitutional provision only applies to the Legislature. But, in *Schultz v. City of Phoenix*, 18 Ariz. 35, 156 P. 75 (1916), our supreme court stated this provision also applied to a city charter enacted by the voters.

10. Although we have concluded House Bill 2593 is ineffective, we believe a few comments are in order regarding the superior court's conclusion the VPA is inapplicable to A.R.S. § 16–941(B). Applying what it characterized as principles of "game theory," the court found the 1998 general election ballot was improperly constituted and the voters likely did not understand the VPA would "apply voter protection to the Clean Elections Act." Game theory, also called theory of games, is defined as "a method of applying mathematical logic to determine which of several available strategies is likely to maximize one's gain or to minimize one's loss in a game, a

business situation, or a military problem in which one's opponent or opponents also can choose between several strategies." Webster's Third New International Dictionary 2371 (2002). Game theory is, as this definition suggests, a predictive tool and not a tool for analyzing past voter intent. Further, we note neither the Secretary nor the President and Speaker have argued in favor of the superior court's game theory reasoning. Finally, the court's application of game theory to conclude the 1998 general election ballot was improperly constituted was an impermissible after-the-fact attack on the 1998 general election. *See generally Fairness and Accountability in Ins. Reform v. Greene*, 180 Ariz. 582, 587, 886 P.2d 1338, 1343 (1994) (procedures before an election cannot be questioned after the vote but must be challenged before the election is held).

the injunction. *E.g., Ariz. Ass'n of Providers for Persons with Disabilities v. State,* 223 Ariz. 6, 12, ¶ 12, 219 P.3d 216, 222 (App.2009). A court may apply these requirements on a "sliding scale." *Id.* Thus, a court may grant preliminary injunctive relief if the moving party establishes either probable success on the merits and the possibility of irreparable injury or the presence of serious questions that go to the merits and the balance of hardships tips sharply in its favor. *Id.*

¶ 33 Here, the superior court concluded that "in light of the First Amendment issues presented," Petitioners had failed to show irreparable harm or that the balance of hardships and public policy favored a preliminary injunction ("the additional factors"). Although the court did not identify the "First Amendment issues presented," based on the arguments of the parties, those issues referred to the arguments of the President and Speaker that the § 941 limits were unconstitutional under the Arizona Constitution and the First Amendment. *See supra* ¶ 7. The court did not, however, make any findings regarding any of the additional factors and provided no analysis of any of the "First Amendment issues presented" or an explanation as to how those issues affected its consideration of the additional factors. Although we disagree with Petitioners that the "First Amendment issues" are not a part of this case,[11] the superior court failed to perform what our supreme court has described as its "legal duty" when it did not make any findings regarding "the First Amendment issues presented" and the additional factors. *Miller v. Bd. of Supervisors of Pinal Cnty.,* 175 Ariz. 296, 299, 855 P.2d 1357, 1360 (1993).

¶ 34 When, as here, a superior court denies a preliminary injunction, Rule 52(a) of the Arizona Rules of Civil Procedure expressly requires the court to "set forth the findings of fact and conclusions of law which constitute the grounds of its action." Findings and conclusions allow the unsuccessful party to

decide whether the case presents issues for appellate review and clarify what has been decided. Findings and conclusions also prompt judges to consider issues carefully because " 'they are required to state not only the end result of their inquiry, but the process by which they reached it.' " *Miller,* 175 Ariz. at 299, 855 P.2d at 1360 (quoting *United States v. Merz,* 376 U.S. 192, 199, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964)). Further, and of critical importance here, findings permit an appellate court to examine the basis and grounds relied on by a superior court in reaching "the ultimate judgment." *Id.*

¶ 35 Findings of fact are sufficient if they are " 'pertinent to the issues and comprehensive enough to provide a basis for the decision.' " *Id.* (quoting *Gilliland v. Rodriquez,* 77 Ariz. 163, 167, 268 P.2d 334, 337 (1954)). Findings satisfy this standard if they allow an appellate court "to test the validity of the judgment," to discern "more than a permissible interpretation of the trial court's analysis," and to understand "how the trial court actually arrived at its conclusion." *Id.* (emphasis omitted) (citations omitted) (internal quotation marks omitted). Further, the findings must encompass all of the "ultimate facts," which "are *at least* 'the essential and determinative facts on which the conclusion was reached. They are the controlling facts, without which the court cannot correctly apply the law' in resolving the disputed issues in the case." *Id.* at 300, 855 P.2d at 1361 (quoting *Star Realty Co. v. Sellers,* 73 N.M. 207, 208–09, 387 P.2d 319, 320 (1963)).

¶ 36 The superior court's findings regarding the additional factors do not, as a matter of law, meet the requirements of Rule 52(a). In effect, the superior court merely stated Petitioners had come up short regarding the additional factors "in light of the First Amendment issues presented." We have no way of knowing how it balanced or weighed

---

11. Petitioners argue, as they did in the superior court, that because they are only challenging House Bill 2593 any attack on the constitutionality of the § 941 limits should be raised in a separate lawsuit. We disagree. The President and Speaker have argued that if House Bill 2593 is ineffective--as we have now held--the § 941 limits are unconstitutionally low. We see no

legal impediment to the President and Speaker challenging the constitutionality of the § 941 limits on remand. Indeed, in the superior court, Petitioners noted the President and Speaker could challenge the § 941 limits "by filing a cross-claim against the Secretary and a counterclaim against the Commission to prevent them from enforcing [those] limits."

the additional factors. Moreover, and of equal importance, we cannot tell what First Amendment issues it considered and how it evaluated those issues. The court's failure to explain how it considered the "First Amendment issues presented" is especially troublesome here.[12]

■ ¶ 37 The First Amendment protects political expression. Nevertheless, in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court upheld government limits on political contributions because limiting the amount of money a person may give to a candidate or campaign organization involves "little direct restraint on [a person's] political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at 21, 96 S.Ct. at 636. Contribution limits are constitutional if they are "closely drawn" to match "sufficiently important" governmental interests. *Id.* at 25, 96 S.Ct. at 638. Although the Supreme Court has never set a constitutional minimum for contribution limits, it has explained that contribution limits would be constitutionally suspect if they prevent candidates and political committees from obtaining the resources necessary for effective advocacy, render political association ineffective, or "drive the sound of a candidate's voice below the level of notice, and render contributions pointless." *Nixon v. Shrink Mo. Gov't PAC,* 528 U.S. 377, 395–97, 120 S.Ct. 897, 908–09, 145 L.Ed.2d 886 (2000).

¶ 38 The concerns identified by the Supreme Court that would cause a campaign contribution limit to violate the First Amendment present questions of fact. Indeed, in *Shrink,* the court noted that the challengers to the contribution limits at issue there had failed to present evidence the system "suppressed political advocacy that would be unconstitutional under *Buckley*" or had impeded the ability of candidates to mount a campaign. *Id.* at 396, 120 S.Ct. at 909. And, in *Randall v. Sorrell,* 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006),

Justice Breyer, in a plurality decision, concluded the state contribution limits at issue there were unconstitutional, but did so based on a developed record that allowed for an analysis of not only the dollar amounts of the contribution limits, but also their effect on political parties, the ability of candidates to raise the funds necessary to run competitive campaigns, the ability of political parties to help elect their candidates, and the ability of individual citizens to volunteer in political campaigns. Based on a close examination of the developed record, Justice Breyer concluded the state limits there were not closely drawn to meet constitutionally-permitted objectives.

¶ 39 Here, because the superior court did not make any findings, we cannot determine how the court considered the constitutional concerns identified by the Supreme Court. As in *Miller,* the superior court "omitted the ultimate or key facts," 175 Ariz. at 300, 855 P.2d at 1361, that would allow us to determine whether it had correctly assessed the additional factors which, according to its order, turned entirely on its assessment of the "First Amendment issues presented." The question then becomes, what is the appropriate relief?

*IV. Appropriate Relief*

■ ¶ 40 When a superior court fails to comply with Rule 52(a), our obligation is to "tailor the proper remedy." *Id.* Normally, the proper remedy is to remand the case to the superior court for findings. *Id.* Under the circumstances of this case, however, remand only for the entry of findings is not an adequate remedy.

¶ 41 The situation before us is unusual. Petitioners sued the Secretary to enjoin his implementation and enforcement of House Bill 2593 as to non-participating candidates for statewide and legislative office. The superior court denied relief and thus allowed the Secretary to begin implementing and enforcing House Bill 2593 based, in part, on its conclusion that A.R.S. § 16–941(B) merely adopted a formula--a conclusion we have re-

---

**12.** We acknowledge the President and Speaker have also argued the § 941 limits violate the Arizona Constitution. Given our resolution of the issues discussed in this opinion, we do not need to address that argument.

jected--and, in part, on the additional factors "in light of the First Amendment issues presented"--a "finding" that fails to comply with Rule 52(a). Given this situation, we have concluded that the proper remedy is to vacate the superior court's order denying preliminary injunctive relief in its entirety and remand to the superior court for it to reconsider Petitioners' request for declaratory and preliminary and permanent injunctive relief. On remand, the court should consider the arguments and evidence presented by the parties regarding the constitutionality of the § 941 limits. The court should factually assess and measure the § 941 limits against the concerns identified by the Supreme Court. The court should then make findings of fact and conclusions of law that meet the requirements of Rule 52(a).[13]

¶ 42 In our order accepting special action jurisdiction, and as we subsequently clarified, we preliminarily enjoined the Secretary from enforcing or implementing the provisions in Sections 1 and 2 of House Bill 2593 that increased the limits for contributions to non-participating candidates for statewide and legislative office and repealed the aggregate limits on annual contributions by individuals to such candidates as well as political committees that gave to such candidates pending further order of this court. We issued this order to reinstate the status quo in existence before September 13, 2013, when House Bill 2593 became effective. The superior court shall maintain this preliminary injunction in effect pending its decision on remand. We issue this directive for several reasons.

¶ 43 First, the § 941 limits are in effect; those provisions of House Bill 2593 applicable to non-participating candidates for statewide and legislative office are not.

¶ 44 Second, in requesting injunctive relief and in responding to the arguments of the President and Speaker regarding the constitutionality of the § 941 limits, Petitioners presented "serious questions," that is, a prima facie case, that the § 941 limits satisfy

the First Amendment concerns identified by the Supreme Court. *See Ariz. Ass'n of Providers,* 223 Ariz. at 12, ¶ 13, 219 P.3d at 222 (existence of "serious questions" for entry of preliminary injunction turns on the strength of the legal claim; " 'courts agree that [a] plaintiff must present a prima facie case but need not show that he is certain to win.' " (quoting 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2948.3 (West 2009))). In addition to the reasons that led to the passage of the Clean Elections Act, Petitioners presented the superior court with evidence the § 941 limits have not significantly restricted the amount of funding available to challengers to run competitive campaigns and have treated political parties differently from other contributors, exempted the value of volunteer services from contribution limits, and allowed for inflation adjustment. Although the President and Speaker disputed this evidence, and, on the existing record, this evidence does not show Petitioners are "certain to win," it at least demonstrates the existence of "serious questions" regarding the constitutionality of the § 941 limits for purposes of a preliminary injunction. We emphasize, however, that we have reached no opinion as to the ultimate resolution of the parties' arguments regarding the constitutionality of the § 941 limits under the Arizona Constitution and the First Amendment.

¶ 45 Third, Petitioners have demonstrated that the balance of hardships tips sharply in their favor. The § 941 limits have been in place for several years, incumbents and challengers have relied on those limits in deciding whether to run with public or private money, and the Secretary's enforcement and implementation of House Bill 2593 may have driven candidates away from the public financing system created by the Clean Elections Act. Preliminary injunctive relief until the superior court issues its decision on remand will simply reinstate and maintain this long-standing status quo.

---

**13.** On remand, the court may conduct further proceedings consistent with this opinion. In this regard, we note Petitioners asked the court to consolidate the hearing on their request for a preliminary injunction with a trial on the merits, *see* Ariz. R. Civ. P. 65(a)(2), and the President and Speaker also requested an evidentiary hearing on Petitioners' request for a preliminary injunction.

## CONCLUSION

¶ 46 For the foregoing reasons, we vacate the superior court's order denying preliminary injunctive relief in its entirety, remand to the superior court for it to reconsider Petitioners' request for declaratory and preliminary and permanent injunctive relief, and, pending its decision on remand, direct the superior court to maintain the preliminary injunction currently in effect enjoining the Secretary from enforcing or implementing the provisions of House Bill 2593 applicable to non-participating candidates for statewide and legislative office.

CONCURRING: RANDALL M. HOWE, Presiding Judge and PATRICIA A. OROZCO, Judge.