IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**KAY FRANKLIN,**
*Plaintiff,*

*v.*

**CSAA GENERAL INSURANCE COMPANY,**
*Defendant.*

No. CV-22-0266-CQ
Filed July 28, 2023

Certified Questions from the United States District Court
The Honorable John J. Tuchi, Judge
No. CV-22-00540-PHX-JJT
**QUESTIONS ANSWERED**

COUNSEL:

Evan Goldstein, Goldstein Woods & Alagha, Phoenix; Robert B. Carey, John M. DeStefano (argued), E. Tory Beardsley, Hagens Berman Sobol Shapiro LLP, Phoenix; and Sam Saks, Guidant Law PLC, Tempe, Attorneys for Kay Franklin

Kymberly Kochis (argued), Eversheds Sutherland (US) LLP, New York, NY; and Parker C. Bunch, William M. Demlong, The Cavanagh Law Firm, P.A., Phoenix, Attorneys for CSAA General Insurance Company

Jared Sutton, Jennifer Lee-Cota, Papetti Samuels Weiss McKirgan LLP, Scottsdale, Attorneys for Amici Curiae Farmers Casualty Insurance Company F/K/A Metropolitan Casualty Insurance Company, Farmers Group Property and Casualty Insurance Company F/K/A Metropolitan Group Property and Casualty Insurance Company, and Economy Preferred Insurance Company

Brett L. Slavicek, Justin Henry, The Slavicek Law Firm, Phoenix, Attorneys for Amici Curiae Cameron Bode, Jesus Caballero, Charles Creasman, Brian Dorazio, Craig Hacker, Christian Loughran, Charles Miller, Jodi Moshier, Michael Moshier, Jose Rios, and Chase Whitehead

Ian M. Fischer, Micalann C. Pepe, Kate A. Myers, Jaburg & Wilk P.C.,

Phoenix, Attorneys for Amicus Curiae Amica Mutual Insurance Company

Charles W. Wirken, Jay R. Graif, Gust Rosenfeld P.L.C., Phoenix, Attorneys for Amici Curiae American Property Casualty Insurance Association and National Association of Mutual Insurance Companies

Myles P. Hassett, Jamie A. Glasser, David R. Seidman, Hassett Glasser, P.C., Phoenix, Attorneys for Amicus Curiae Independent Insurance Agents and Brokers of Arizona

Josh M. Snell, Patrick C. Gorman, Jones, Skelton & Hochuli P.L.C., Phoenix; and Kim E. Rinehart, Wiggin and Dana LLP, New Haven, CT, Attorneys for Amicus Curiae Trumbull Insurance Company

Mick Levin, Mick Levin, P.L.C., Phoenix, Attorney for Amicus Curiae Arizona Association for Justice

————————————

JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, JUSTICES BOLICK, BEENE, MONTGOMERY, and KING joined.

————————————

JUSTICE LOPEZ, Opinion of the Court:

¶1     The United States District Court for the District of Arizona certified two questions for our review: (1) Does A.R.S. § 20-259.01 mandate that a single policy insuring multiple vehicles provides different underinsured motorist ("UIM") coverages for each vehicle, or a single UIM coverage that applies to multiple vehicles?; and (2) Does A.R.S. § 20-259.01(B) bar an insured from receiving UIM coverage from the policy in an amount greater than the bodily injury liability limits of the policy?

¶2     We hold that § 20-259.01 mandates that a single policy insuring multiple vehicles provides different UIM coverages for each vehicle.  Notwithstanding creative policy drafting intended to evade statutory requirements—including technical definitions of coverages and extensive limitation of liability clauses—insurers seeking to prevent

insureds from stacking UIM coverages under a single, multi-vehicle policy must employ subsection (H)'s sole prescribed method for limiting stacking. We also hold that § 20-259.01(B), by its plain language and non-stacking function, does not bar an insured from receiving UIM coverage from the policy in an amount greater than the bodily injury or death liability limits of the policy.

## BACKGROUND

¶3        Kay Franklin's mother perished in an automobile accident caused by a negligent driver. After collecting the per-person liability limit of the negligent driver's insurance policy, $25,000, Franklin submitted a UIM claim[1] to her mother's insurer, CSAA General Insurance Company ("CSAA"). At the time of the accident, the mother's CSAA policy (the "Policy") covered the mother's two vehicles and provided $50,000 of UIM coverage "per person." The Policy also contained a limitation of liability clause, stating in relevant part:

> The Limit of Liability shown on the **Dec Page** is the most we
> will pay regardless of the number of:
> . . . .
> 2.        **covered cars**;
> . . . .
> 7.        premiums paid.

¶4        Although CSAA paid $50,000, Franklin sought an additional $50,000 under a "stacking" theory. According to Franklin, the inclusion of her mother's second vehicle in the Policy indicated that the Policy provided a separate, additional UIM coverage that Franklin can stack, thereby increasing her mother's total UIM coverage from $50,000 to $100,000. Franklin's stacking theory is generally referred to as "intra-policy stacking" where multiple UIM coverages under a single policy are stacked, as

---

[1] UIM coverage applies when an insured is injured or killed by a negligent driver whose liability coverage is insufficient to pay for the damages caused. § 20-259.01(G). Similarly, uninsured motorist ("UM") coverage applies where the negligent driver is not covered by a policy with minimum liability limits required by statute. § 20-259.01(E).

distinguished from "inter-policy stacking," where the UIM coverages of multiple policies on different vehicles are stacked.[2]

**¶5** In asserting that the Policy permitted intra-policy stacking, Franklin emphasized CSAA's failure to comply with § 20-259.01(H), also known as the "anti-stacking" provision of Arizona's Uninsured/Underinsured Motorist Act (the "UMA"), which Franklin claims provides the sole method for limiting UIM coverage stacking in Arizona. In other words, Franklin argues that CSAA's failure to comply with the statute meant that the Policy failed to preclude intra-policy stacking.

**¶6** CSAA rejected Franklin's claim for an additional $50,000, contending that the Policy provided a single UIM coverage and that there was no additional coverage to stack. Franklin then sued CSAA in federal district court for declaratory judgment, alleging breach of contract and bad faith. Franklin later amended the complaint to allege a class action on behalf of other parties insured by CSAA and similarly situated to her.

**¶7** CSAA filed a motion for the district court to certify the two questions presented here, which the court granted. We accepted review to clarify how § 20-259.01 regulates insurers' ability to preclude insureds from intra-policy stacking UIM coverages. We have jurisdiction under article 6, section 5(6) of the Arizona Constitution and A.R.S. § 12-1861.

## DISCUSSION

**¶8** Both certified questions arise from differing interpretations of the UMA. When interpreting statutes, we begin with the text. *See 4QTKIDZ, LLC v. HNT Holdings, LLC*, 253 Ariz. 382, 385 ¶ 5 (2022) ("'When the plain text of a statute is clear and unambiguous,' it controls unless an absurdity or constitutional violation results." (quoting *Sell v. Gama*, 231 Ariz. 323, 327 ¶ 16 (2013))). If ambiguous, we interpret the text with "secondary principles of statutory interpretation, such as 'the context of the statute, the language used, the subject matter, its historical background, its effects and consequences, and its spirit and purpose.'" *Ariz. Citizens Clean*

---

[2] *See Rashid v. State Farm Mut. Auto. Ins. Co.*, 163 Ariz. 270, 272 n.2 (1990).

*Elections Comm'n v. Brain*, 234 Ariz. 322, 325 ¶ 11 (2014) (quoting *Wyatt v. Wehmueller*, 167 Ariz. 281, 284 (1991)).

**I.**

**¶9** The first certified question asks whether § 20-259.01 mandates that a single policy insuring multiple vehicles provides separate UIM coverages for each vehicle or a single UIM coverage that applies to multiple vehicles. Stated differently, the first question is whether § 20-259.01 classifies multi-vehicle insurance policies as providing a single UIM coverage or multiple UIM coverages for each vehicle. We conclude that the statute's text is ambiguous, but the statute's history and purpose clearly indicate that multi-vehicle policies provide separate UIM coverages for each vehicle.

**A.**

**¶10** The UMA's pertinent language concerning intra-policy stacking resides in § 20-259.01(H). *See Am. Family Mut. Ins. Co. v. Sharp*, 229 Ariz. 487, 491 ¶ 12 (2012) ("Subsection (H) is the only UMA provision that authorizes any limitation of UM or UIM coverage."). Subsection (H) provides:

> If multiple policies or coverages purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one policy or coverage, selected by the insured, shall be applicable to any one accident. If the policy does not contain a statement that informs the insured of the insured's right to select one policy or coverage as required by this subsection, within thirty days after the insurer receives notice of an accident, the insurer shall notify the insured in writing of the insured's right to select one policy or coverage.

§ 20-259.01(H). Thus, the statute dictates how insurers can prevent insureds from stacking UIM or UM coverages. Insurers "may limit" stacking, but insurers must satisfy the statute's notice requirement to inform "the insured of the insured's right to select one policy or coverage," either in the policy itself or in writing "within thirty days after the insurer receives notice of [the] accident." *Id.*

¶11        We emphasize the statutory requirement that, to prevent stacking, insurers must include in the policy unambiguous language plainly disavowing the possibility of stacking.  CSAA argues that subsection (H)'s text mandating insurers to provide written notice "within thirty days" permits insurers to preclude UIM coverage stacking after "[the] accident" has occurred irrespective of the policy's underlying language. Reading the statute to allow insurers to unilaterally limit coverage *after* the policy agreement's execution would violate basic principles of contract law that require additional consideration and mutual assent for changes to an existing contract.  *See Cornell v. Desert Fin. Credit Union*, 254 Ariz. 477, 480 ¶ 12 (2023) ("Once a bilateral contract is formed, its terms cannot be modified absent an additional offer, acceptance, and consideration."). Thus, to limit stacking under subsection (H), insurers must (1) expressly and plainly limit stacking in the policy and (2) satisfy the notice requirement informing the insured of their "right to select one policy or coverage" either in the policy itself or in writing to the insured within thirty days after the insurer is notified of the accident.  § 20-259.01(H).

¶12        Subsection (H) only addresses situations where "multiple policies or coverages *purchased* by one insured on different vehicles apply to an accident or claim."  *Id.* (emphasis added).  Thus, as the district court recently observed, the statute mandates that "[b]efore being allowed to stack coverages . . . , [insureds] must have actually *purchased* multiple policies or coverages on different vehicles."  *Heaton v. Metro. Grp. Prop. & Cas. Ins. Co.*, No. CV-21-00442-PHX-SRB, 2021 WL 6805629, at *5 (D. Ariz. Oct. 19, 2021) (emphasis added).  *Heaton* elaborated on this point:

> Oftentimes, this is a straightforward exercise. In the case of a single policy containing UM and UIM coverage on one vehicle, there is nothing for an insured to stack because there is one UM coverage and one UIM coverage available to the insured. Likewise, if an insured has multiple policies with an insurer, and each policy covers a different vehicle and contains UM/UIM coverage, then there are multiple policies on different vehicles and the insured may stack the policies if the insurer does not adhere to the requirements of [s]ubsection (H). This case, however, presents a situation that has not yet been addressed by the Arizona Supreme Court: a single, multi-vehicle policy that allegedly only provides a

single UM and UIM coverage that is shared by all the listed vehicles.

*Id.* Thus, the dispositive issue becomes whether an insured covered under a single, multi-vehicle policy necessarily *purchased* multiple UIM coverages for each vehicle, triggering subsection (H). *See* § 20-259.01(H).

**¶13** The *Heaton* court analyzed the statute's text and noted that "nothing in the UMA explicitly addresses whether a multi-vehicle policy necessarily provides multiple coverages." 2021 WL 6805629, at *6. The court then employed secondary interpretation principles, suggesting that it implicitly found ambiguity in the statute. *See id.* (relying on statutory history and Arizona court precedent interpreting the UMA "in the context of public policy concerns" in concluding that "policies providing UM and UIM coverage on multiple vehicles necessarily provide 'multiple coverages' under the statute"); *see also Brain*, 234 Ariz. at 325 ¶ 11 (opining that ambiguous text is interpreted with "secondary principles of statutory interpretation").

**¶14** CSAA challenges *Heaton*'s interpretation of subsection (H), arguing that it conflicts with Arizona precedent. *See Hampton v. Allstate Ins. Co.*, 126 Ariz. 403, 405 (App. 1980) (denying UIM stacking where a policy "clearly limit[ed] [the insurer's] liability for damages to any one person as a result of one accident . . . to the sum of $15,000 and the fact that three vehicles are described and three premiums charged does not warrant construing policy to allow stacking"). CSAA also contends that, because certain subsections of the statute describe UIM coverage as "coverage for persons," not "vehicles," the statute unambiguously precludes construing a policy to include a separate UIM coverage for each vehicle. *See* § 20-259.01(B) (requiring insurers to offer "[UIM] coverage that extends to and covers all *persons*" (emphasis added)); § 20-259.01(G) ("[UIM] coverage includes coverage for a *person* . . . ." (emphasis added)). We are not persuaded.

**¶15** First, *Hampton* is distinguishable. *Hampton* did not interpret the UMA when it held that policy language may preclude intra-policy stacking. 126 Ariz. at 405 (considering and rejecting an insured's public policy arguments against enforcing a policy's limitation of liability clause). This makes sense considering that the UMA was not considered applicable

to intra-policy stacking scenarios at the time. *See State Farm Mut. Auto. Ins. Co. v. Lindsey*, 182 Ariz. 329, 332 (1995) (stating in dicta that insurers may prevent stacking by issuing a single policy covering multiple vehicles). Thus, *Hampton* does not address whether insureds covered under a multi-vehicle policy have necessarily "purchased" multiple UIM coverages per vehicle under the current UMA.

¶16      Second, the language in subsections (B) and (G) describing coverage for "persons" simply illustrates the general understanding that UIM coverage applies for the benefit of "persons." For example, insurers may not deny coverage solely on the grounds that a covered person was injured in a vehicle owned by the insured but not listed in the policy. *Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 297 (1985). As such, the language describing UIM coverage as "for persons" does not address whether an insured has *purchased* multiple UIM coverages.

¶17      Moreover, we prioritize consistency when construing statutory provisions. *See, e.g.*, *Vangilder v. Ariz. Dep't of Rev.*, 252 Ariz. 481, 487 ¶ 22 (2022). Interpreting subsections (B) and (G) as implicitly barring intra-policy stacking directly contravenes subsection (H)'s express reference to intra-policy stacking and obviates its sole purpose. *See* § 20-259.01(H) ("If multiple policies *or coverages* purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one policy *or coverage*, selected by the insured, shall be applicable to any one accident." (emphasis added)). The statute's use of "or coverage" next to "policy" distinguishes the two terms in contemplation of both intra-policy and inter-policy stacking scenarios. *See Heaton*, 2021 WL 6805629, at *5 (noting that "in 1997, the legislature expanded subsection (H) to include intra-policy stacking").

¶18      Critically, subsection (H), not subsections (B) and (G), limits intra-policy stacking. *See Sharp*, 229 Ariz. at 491 ¶ 12 ("Subsection (H) is the only UMA provision that authorizes any limitation of UM or UIM coverage."). Accordingly, we agree with *Heaton* that the statute's text does not explain how or when multiple UIM coverages in a multi-vehicle policy are "purchased."

¶19      Dictionaries define "purchased" as "bought" or "paid for." *Purchase*, Black's Law Dictionary (11th ed. 2019) ("The act or an instance of

buying."); *Purchase*, Merriam-Webster, https://www.merriam-webster.com/dictionary/purchase (last visited July 25, 2023) ("[T]o obtain by paying money or its equivalent."). These definitions, coupled with the statute's silence, show that it is equally plausible to interpret "multiple . . . coverages purchased" in subsection (H) in two ways. First, as the *Heaton* court implicitly found, "coverages purchased" can broadly signify wherever an insured *pays* multiple premiums for each vehicle under a multi-vehicle policy, regardless of technical policy language defining "UIM coverage" to be a single coverage. *See Heaton*, 2021 WL 6805629, at *6. Second, "coverages purchased" may be more narrowly construed, touching only where the multi-vehicle policy's plain language states that an insured has purchased multiple UIM coverages. *Cf. Hampton*, 126 Ariz. at 405.

¶20 Because "coverages purchased" under subsection (H) is "reasonably susceptible to differing interpretations," we find that it is ambiguous. *See Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9 (2016). Specifically, the statute's text is unclear as to whether all multi-vehicle policies contain multiple *purchased* UIM coverages for each vehicle, thereby triggering subsection (H), or whether insurers may define "coverages" *purchased* in the policy to be a single coverage, thereby avoiding subsection (H)'s application entirely.

**B.**

¶21 The text's ambiguity warrants application of secondary interpretive principles, including consideration of the statute's context, history, and purpose. *See Brain*, 234 Ariz. at 325 ¶ 11; *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012) (stating that statutory history "form[s] part of the context of the statute, and (unlike legislative history) can properly be presumed to have been before all the members of the legislature when they voted"). In 1995, subsection (H)[3] read as follows:

> If multiple policies or coverages purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one *policy*, selected by the insured, shall be applicable to any one accident.

---

[3] In 1995, subsection (H) was codified as A.R.S. § 20-259(F). *See Lindsey*, 182 Ariz. at 331.

Uninsured and Underinsured Motorist Act, 1982 Ariz. Sess. Laws ch. 298, § 1(F) (2d Reg. Sess.) (emphasis added). In the same year, this Court suggested in dicta that insurers could limit UIM stacking by issuing a single, multi-vehicle policy as opposed to issuing multiple policies for each vehicle. *See Lindsey*, 182 Ariz. at 332 ("We do not suggest that [the insurer] . . . does not have the right to preclude coverage stacking . . . . We merely find that this insurer did not take the steps necessary to effectuate the limitation. It might have done so by issuing one policy on all three vehicles.").

¶22        However, in 1997, the legislature added a notice requirement and the additional language "or coverage" to subsection (H) as follows:

> If multiple policies or coverages purchased by one insured on different vehicles apply to an accident or claim, the insurer may limit the coverage so that only one policy *or coverage*, selected by the insured, shall be applicable to any one accident. If the policy does not contain a statement that informs the insured of the insured's right to select one policy *or coverage* as required by this subsection, within thirty days after the insurer receives notice of an accident, the insurer shall notify the insured in writing of the insured's right to select one policy *or coverage*.

§ 20-259.01(H) (emphasis added).

¶23        CSAA argues that the 1997 amendment merely solidified subsection (H)'s application in the inter-policy stacking context. We disagree. *Lindsey* reaffirmed subsection (H)'s application in the inter-policy context, obviating any need to amend the statute for this purpose. *See* 182 Ariz. at 332 (permitting inter-policy stacking where the insurer failed to satisfy the UMA's requirements). Instead, the 1997 amendment's addition of "or coverage" to subsection (H) was likely to (1) reject *Lindsey*'s "single coverage" method for limiting stacking; (2) explicitly recognize intra-policy stacking; and (3) establish subsection (H) as the sole means by which insurers may limit intra-policy stacking. *See Heaton*, 2021 WL 6805629, at *6. As such, allowing insurers to define coverages as a sole coverage in the policy, *see Lindsey*, 182 Ariz. at 332; *cf. Hampton*, 126 Ariz. at 405, would permit circumvention of subsection (H) entirely, essentially rendering the

1997 amendment meaningless. Thus, § 20-259.01's statutory history demonstrates that, for purposes of triggering subsection (H), all multi-vehicle policies necessarily provide multiple UIM coverages per vehicle that insureds have "purchased."

¶24 In sum, § 20-259.01's text and history support a broad interpretation of "coverages purchased" that recognizes a separate UIM coverage "purchased" for each vehicle in a multi-vehicle policy. This interpretation aligns with the UMA's object to afford insureds coverage. *See* A.R.S. § 1-211(B) ("Statutes shall be liberally construed to effect their objects and to promote justice."). We agree with *Heaton* that the purpose of subsection (H), as amended, is to provide the sole means by which insurers may limit UIM/UM stacking—whether intra-policy or inter-policy—and allowing insurers to circumvent the statute by defining UIM coverages as a sole coverage in the policy would render subsection (H) meaningless.

## II.

¶25 The second certified question asks whether § 20-259.01(B) bars an insured from receiving UIM coverage from the policy in an amount greater than the bodily injury liability limits of the policy. In other words, it asks whether subsection (B) imposes a ceiling on UIM coverage based on the bodily injury or death liability limits of the policy.

¶26 When interpreting a statutory provision, we consider the statute as a whole, reading the provision's words in context. *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). Subsection (B), in relevant part, provides as follows:

> Every insurer writing automobile liability or motor vehicle liability policies shall also make available to the named insured thereunder and shall by written notice offer the named insured and at the request of the named insured shall include within the policy underinsured motorist coverage that extends to and covers all persons insured under the policy, *in limits not less than* the liability limits for bodily injury or death contained within the policy. . . . At the request of the named insured, the named insured may purchase and the insurer shall then include within the policy underinsured motorist coverage that extends to and covers all persons

11

insured under the policy in any amount authorized by the insured *up to the liability limits* for bodily injury or death contained within the policy.

§ 20-259.01(B) (emphasis added). Subsection (B), as a whole, reflects two primary functions that relate to the offer and purchase of UIM coverage. First, subsection (B) dictates that insurers must initially *offer* insureds UIM coverage with "limits *not less than* the liability limits for bodily injury or death." *Id.* (emphasis added). The legislature's use of the words "not less than" means that, at a minimum, the insurer must offer UIM coverage that is *at least* the same amount of the policy's bodily injury or death liability limits.

¶27 Second, subsection (B) permits insureds to request and purchase UIM coverage in any amount that the insured selects. Insureds may reject the insurers' initial offer and "request" UIM coverage "in any amount . . . up to the liability limits for bodily injury or death contained within the policy." *Id.* Upon making such a request, the insured "may purchase and the insurer shall then include [the requested coverage] within the policy." *Id.* In other words, insureds are entitled to purchase coverage less than what insurers are obligated to initially offer, but the insureds themselves must first request the lesser coverage. *Id.* Also, in such an instance, as distinct from where an insured purchases coverage "in an amount equal to the limits for bodily injury or death," insurers must offer the lesser coverage using a special "form approved by the director" of the Arizona Department of Insurance ("DOI"). *Id.*

¶28 CSAA argues that subsection (B)'s use of "up to" imposes a ceiling on insureds' ability to receive UIM coverage exceeding bodily injury or death liability limits contained in the policy, *cf. Green v. Mid-Am. Preferred Ins. Co.*, 156 Ariz. 265, 273 (App. 1987) ("[A]n insured is precluded from purchasing a greater amount of underinsured coverage than liability coverage."), as evinced by insureds' inability to select such coverage in DOI-approved forms. Not so. Subsection (B)'s "up to" language refers to *per-vehicle* coverage, as distinct from *total* UIM coverage in a stacked scenario. When viewed in context, rather than imposing a ceiling on coverage insureds may purchase, the "up to" language merely *obligates* insurers to sell coverage "in any amount" the insured authorizes "up to the liability limits for bodily injury or death contained within the policy." The

insurers' obligation to sell UIM coverage "up to" the liability limits does not statutorily proscribe UIM coverage in excess of those limits.

¶29        Moreover, CSAA's interpretation of subsection (B) would nullify the UMA's definition of UIM coverage in subsection (G).  *See* § 20-259.01(G) ("To the extent that the total damages exceed the total applicable liability limits, the [UIM] coverage provided in subsection B of this section is applicable to the difference.").  Under CSAA's approach, UIM coverage is rendered illusory because, per subsection (G), it only applies where damages exceed bodily injury or death limits in the policy, but, per subsection (B), UIM coverage may never exceed bodily injury or death liability limits.  While one may argue that subsection (G)'s reference to "total applicable liability limits" addresses the tortfeasor's liability limits, not the insured's, subsection (G) does not expressly distinguish the two.  *Id.*

¶30        Additionally, if subsection (B) imposed a cap on total UIM coverage receivable, then subsection (H) would be rendered superfluous because stacked UIM coverages would almost always exceed the policy's bodily injury or death liability limits.  *See Vangilder*, 252 Ariz. at 487 ¶ 22 ("[This Court] avoid[s] interpretations that render statutory provisions meaningless, unnecessary, or duplicative." (quoting *Ariz. Dep't of Revenue v. Action Marine, Inc.*, 218 Ariz. 141, 143 ¶ 10 (2008))).  Such an interpretation is also contrary to our jurisprudence that recognizes subsection (H) as "the only UMA provision that authorizes any limitation of UM or UIM coverage."  *Sharp*, 229 Ariz. at 491 ¶ 12; *see also* § 20-259.01(H) (detailing insurers' exclusive means of limiting intra-policy stacking).

¶31        At first glance, *Green* seems inapposite with *Sharp*'s characterization of subsection (H) as containing the UMA's sole limitations of UIM coverage.  *Compare Sharp*, 229 Ariz. at 491 ¶ 12, *with Green*, 156 Ariz. at 273 (stating that "the [UMA] only permits an insured to purchase underinsured motorist coverage 'up to the liability limits for bodily injury or death contained within the policy.'  Thus, an insured is precluded from purchasing a greater amount of [UIM] coverage than liability coverage." (internal citation omitted)).  But this discrepancy is readily explained.  *Green* predates the 1997 amendments to the UMA and did not address the stacking of multiple UIM coverages "per vehicle," but rather "per person." 156 Ariz. at 272–73 (holding that wrongful death plaintiffs were only entitled to a single UIM coverage despite the policy's language affording

"per-person" UIM coverage because the decedent, as the only named insured injured or killed in the accident, was the only person entitled to UIM coverage).

¶32　　　　Finally, CSAA overstates the significance of the DOI-approved forms in interpreting subsection (B).　Although the forms are appropriately understood as offering a safe harbor for insurers in meeting their duty to make a written offer where insureds purchase UIM coverage below the policy's bodily injury or death liability limits, *Ballestros v. Am. Standard Ins. Co. of Wis.*, 226 Ariz. 345, 348 ¶ 9, 349–50 ¶ 20 (2011), the forms do not operate as a statutory limit on the amount of UIM coverage a policy may provide.

¶33　　　　Subsection (B) is silent concerning stacking.　Instead, it codifies requirements pertaining to the offer and purchase of UIM coverage, but does not restrict what an insurer may be obligated to pay out pursuant to a claim.　If the insured requests UIM coverage with limits exceeding "the liability limits for bodily injury or death," then the insurer may provide the requested coverage free from any further constraint by subsection (B).　§ 20-259.01(B).

## CONCLUSION

¶34　　　　In answering the certified questions, we hold that (1) § 20-259.01's text, history, and purpose provide that an insured covered by a multi-vehicle policy has necessarily "purchased" multiple UIM coverages for each vehicle under subsection (H); thus, rather than employing singular definitions of "coverage" in their policies, insurers must comply with the statute's requirements in order to prevent insureds from intra-policy stacking; and (2) § 20-259.01(B) does not limit UIM coverage.